# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA,
### INDIANAPOLIS DIVISION

MURPHY L. SMITH,

      **Plaintiff,**

    *vs.*

CAROLYN COLVIN, **Commissioner of** Social Security,

      **Defendant.**

**CAUSE NO.  1:13-cv-1956-DKL-JMS**

## ENTRY

Defendant, the Commissioner of Social Security, denied Murphy L. Smith's application for disability benefits under the Social Security Act and he commenced this suit to obtain judicial review of that denial.  For the reasons set forth below, the denial is reversed and Mr. Smith's claim is remanded to the Commissioner for reconsideration.

## Standards

Judicial review of the Commissioner's factual findings is deferential:  courts must affirm if her findings are supported by substantial evidence in the record.  42 U.S.C. ▪ 405(g); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).  Substantial evidence is more than a scintilla, but less than a preponderance, of the evidence.  *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001).  If the evidence is sufficient for a reasonable person to conclude that it adequately supports the Commissioner's decision, then it is substantial evidence.  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Carradine v. Barnhart*, 360 F.3d 751, 758

(7th Cir. 2004). This limited scope of judicial review derives from the principle that Congress has designated the Commissioner, not the courts, to make disability determinations:

> In reviewing the decision of the ALJ [administrative law judge], we cannot engage in our own analysis of whether [the claimant] is severely impaired as defined by the SSA regulations. Nor may we reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner. Our task is limited to determining whether the ALJ's factual findings are supported by substantial evidence.

*Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). *Carradine*, 360 F.3d at 758. While review of the Commissioner's factual findings is deferential, review of her legal conclusions is *de novo*. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a). A person will be determined to be disabled only if his impairments "are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or

whether he would be hired if he applied for work."  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).  20 C.F.R. §§ 404.1505, 404.1566, 416.905, and 416.966.  The combined effect of all of an applicant's impairments shall be considered throughout the disability determination process.  42 U.S.C. ▪§ 423(d)(2)(B) and 1382c(a)(3)(G).  20 C.F.R. §§ 404.1523 and 416.923.

The Social Security Administration has implemented these statutory standards in part by prescribing a "five-step sequential evaluation process" for determining disability. If disability status can be determined at any step in the sequence, an application will not be reviewed further.  At the first step, if the applicant is currently engaged in substantial gainful activity, then he is not disabled.  At the second step, if the applicant's impairments are not severe, then he is not disabled.  A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."  Third, if the applicant's impairments, either singly or in combination, meet or medically equal the criteria of any of the conditions included in the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, Part A, then the applicant is deemed disabled.  The Listing of Impairments are medical conditions defined by criteria that the Social Security Administration has pre-determined are disabling.  20 C.F.R. ▪ 404.1525.  If the applicant's impairments do not satisfy the criteria of a listing, then her residual functional capacity ("RFC") will be determined for the purposes of the next two steps.  RFC is an applicant's ability to do work on a regular and continuing basis despite his impairment-related

physical and mental limitations and is categorized as sedentary, light, medium, or heavy, together with any additional non-exertional restrictions. At the fourth step, if the applicant has the RFC to perform his past relevant work, then he is not disabled. Fifth, considering the applicant's age, work experience, and education (which are not considered at step four), and his RFC, the Commissioner determines if he can perform any other work that exists in significant numbers in the national economy. 42 U.S.C. ▪ 416.920(a)

The burden rests on the applicant to prove satisfaction of steps one through four. The burden then shifts to the Commissioner at step five to establish that there are jobs that the applicant can perform in the national economy. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). If an applicant has only exertional limitations that allow her to perform the full range of work at her assigned RFC level, then the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "grids"), may be used at step five to arrive at a disability determination. The grids are tables that correlate an applicant's age, work experience, education, and RFC with predetermined findings of disabled or not-disabled. If an applicant has non-exertional limitations or exertional limitations that limit the full range of employment opportunities at his assigned work level, then the grids may not be used to determine disability at that level. Instead, a vocational expert must testify regarding the numbers of jobs existing in the economy for a person with the applicant's particular vocational and medical characteristics. *Lee v.*

*Sullivan*, 988 F.2d 789, 793 (7th Cir. 1993). The grids result, however, may be used as an advisory guideline in such cases.

An application for benefits, together with any evidence submitted by the applicant and obtained by the agency, undergoes initial review by a state-agency disability examiner and a physician or other medical specialist. If the application is denied, the applicant may request reconsideration review, which is conducted by different disability and medical experts. If denied again, the applicant may request a hearing before an administrative law judge ("ALJ").[1] An applicant who is dissatisfied with the decision of the ALJ may request the SSA's Appeals Council to review the decision. If the Appeals Council either affirms or declines to review the decision, then the applicant may file an action in district court for judicial review. 42 U.S.C. ▪ 405(g). If the Appeals Council declines to review a decision, then the decision of the ALJ becomes the final decision of the Commissioner for judicial review.

## Background

Mr. Smith applied for both disability-insurance and supplemental-security-income benefits under the Social Security Act. He alleged that his disability began in July

---

[1] By agreement with the Social Security Administration, initial and reconsideration reviews in Indiana are performed by an agency of state government, the Disability Determination Bureau, a division of the Indiana Family and Social Services Administration. 20 C.F.R. Part 404, Subpart Q (▪ 404.1601, *et seq.*). Hearings before ALJs and subsequent proceedings are conducted by personnel of the federal Social Security Administration.

2010.  After his claim was denied on initial and reconsideration reviews, (R. 69-80), he received a hearing before an administrative law judge ("ALJ"), at which both he and a vocational expert testified, (R. 29-68).  Mr. Smith was represented at the hearing by present counsel.  The ALJ denied Mr. Smith's claim, (R. 7-28), and, when the Commissioner's Appeals Council denied his request for review, (R. 1-4), the ALJ's written decision became the Commissioner's final decision and the one that the Court reviews.

At step one of the sequential evaluation process, the ALJ found that Mr. Smith had not engaged in substantial gainful activity since his alleged disability-onset date.  At step two, she found that that he has several severe impairments:

1. Diabetes mellitus, uncontrolled with alcohol, but better controlled more recently, with evidence of peripheral neuropathy, onychomylosis, and positive Tinel's signs at tarsel tunnel.

2. Mid-foot degenerative joint disease.

3. Left knee dysfunction described as mild compartment joint space narrowing.

4.  Benign paroxysmal positional vertigo with evidence of vestibular weakness.

5.  Intellectual limitations.

6. Substance-use disorders, including assessments of alcohol, cocaine, and nicotine dependence, and assessment of alcohol-induced depression and mood disorder.

(R. 12-13.)

At step three, the ALJ found that Mr. Smith did not have an impairment or combination of impairments that meet or medically equal any of the conditions in the Listing of Impairments.  She considered listing 1.02, major dysfunction of a joint; the 9.00

series of listings on endocrine disorders, for evaluation of diabetes and related impairments; the 11.00 series of listings on neurological disorders, for evaluation of vertigo; listing 11.14, peripheral neuropathy, for evaluation of the diabetes-related condition; listings 12.04, affective disorders, and 12.09, substance-addiction disorders, for evaluation of his mental impairments.

For the purposes of steps four and five, and after evaluating Mr. Smith's credibility when describing the severity and limiting effects of his symptoms, the ALJ determined Mr. Smith's RFC. She found that he had the RFC for work at the sedentary level with additional postural, environmental, and mental limitations. As relevant to Mr. Smith's arguments in this suit, the additional restrictions are: **(1)** he has the mental capacity to understand, remember, and carry out simple, routine tasks; **(2)** in doing so, he has the capacity to use common-sense understanding to carry out instructions, to deal with several concrete variables in standardized situations, and to perform these mental abilities consistently with the demands of a normal workday schedule; **(3)** he has the capacity for appropriate interaction with supervisors; and **(4)** he has the capacity for "occasional" interaction with co-workers and the general public (defined as having the ability to work in their vicinity), and the capacity for interaction with co-workers and the public for the completion of job tasks up to one-third of the workday.

At step four, the ALJ found that Mr. Smith is unable to perform his past relevant jobs, which were performed at the medium and light exertional levels. At step five, because Mr. Smith's additional, non-exertional restrictions prevented the performance of

the full range of sedentary work, the ALJ relied on the testimony of a vocational expert to find that his RFC, age, education, and work experience permit him to perform other work that exists in significant numbers in the national economy. Therefore, the ALJ found that Mr. Smith was not disabled.

## Discussion

By his *Plaintiff's Amended Brief* [doc. 35], Mr. Smith argues three categories of errors in the ALJ's decision. His original *Plaintiff's Brief* was filed in July 2014, [doc. 24], and the Commissioner filed her response to it in September 2014, [doc. 30]. In October 2014, Plaintiff moved the Court to strike this original brief and to substitute his "corrected" and "completed" brief, his *Plaintiff's Amended Brief*, for it. (*Motion to Strike Document 24 and Substitute Amended Brief* [doc. 33].) In the motion, Mr. Smith's counsel represented that he mistakenly thought that a colleague had completed the original brief and, therefore, filed it, not realizing his mistake until he read the Commissioner's response. (*Id*.) He also asked the Court to allow the Commissioner to respond to his corrected brief and he waived his right to file a reply brief. (*Id*.) On November 21, 2014, the Court granted Mr. Smith's motion and allowed the Commissioner twenty-eight days to file a response and allowed Mr. Smith fourteen days to file a reply. *Order* [doc. 34].

In his motion to substitute briefs, Mr. Smith's counsel stated that he made changes to only the argument and conclusion sections of his brief. However, rather than merely "completing" the argument section of the original brief, the amended brief completely replaced it. Replacement is understandable because, as the Commissioner recognized in

her response to Mr. Smith's original brief, while the background factual discussion of the original brief applies to the present suit, its argument section appears to have been written for a different case. Thus, *Plaintiff's Amended Brief* presents entirely new arguments. Despite this, the Commissioner did not file a new response brief, leaving Mr. Smith's arguments the only ones that are before the Court.

By not filing a response, the Commissioner has subjected Mr. Smith's suit for judicial review to summary ruling. *See* S.D. Ind. L.R. 7-1(c)(4). The Court will not attempt to predict responses that the Commissioner might have made against Mr. Smith's arguments. Instead, the Court will review Mr. Smith's arguments for reasonableness and plain error.

**1. Listings analysis.** Mr. Smith argues that the ALJ committed three errors in her analysis of whether Mr. Smith's impairments meet the criteria of listing 12.04, affective disorders. To be found disabled under that listing, a claimant must satisfy the diagnostic description in the Listing's introductory paragraph and either **(a)** the set of medical findings in paragraph A (which medically substantiate the presence of the mental disorder) and the set of impairment-related functional limitations in paragraph B, or **(b)** the functional criteria in paragraph C. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A ("*Listings*"), §§ 12.00A and 12.04. The ALJ found that the listing was not satisfied because the criteria of Paragraphs B and C were not satisfied. Mr. Smith contends that the ALJ erred in his Paragraph B analysis.

To satisfy the functional-limitation criteria of Paragraph B, a claimant must show that his impairment or combination of impairments has resulted in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.[2]

*Listings* § 12.04B.  The ALJ did not rate Mr. Smith as "marked" in any category and found no qualifying decompensation.  Mr. Smith contends that the ALJ's ratings for criteria 1 through 3 are erroneous.

**a. Activities of daily living.**  The ALJ found that Mr. Smith had only mild restrictions in his activities of daily living because he was able to **(1)** perform light chores under supervision during his substance-abuse rehabilitation; **(2)** leave home to seek work; and **(3)** keep appointments with treatment providers and appointments for group and individual therapy.  (R. 14.)  Mr. Smith argues that the ALJ's reasons are not supported by substantial evidence.

In regard to his ability to perform light chores, Mr. Smith points to evidence showing that he was not able to perform even simple chores, like sweeping and mopping, without instructions, repeated coaching, and close supervision, and that, even with this assistance, he could not perform the chores without great difficulty.  Mr. Smith also points

---

[2] "Extended duration" means "three episodes within 1 year, or an average of one every 4 months, each lasting for at least 2 weeks."  *Listings* § 12.00C4.

to evidence that showed that he was repeatedly admonished for becoming agitated and rude with other facility residents and employees while performing chores and that the chores exacerbated his irritability.

The Commissioner rates the degree of a claimant's restrictions in activities of daily living based on "the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis" and she will consider "the amount of supervision or assistance that you require, and the settings in which you are able to function." 20 C.F.R. § 404.1520a(c)(2). A "marked" limitation "interfere[s] seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." *Listings* § 12.00C. The Commissioner will determine "the extent to which you are capable of initiating and participating in activities independent of supervision or direction." *Id*. § 12.00C1. Whether a claimant's restriction is "marked" is determined not by the number of different activities of daily living that are impaired, "but by the nature and overall degree of interference with function":

> For example, if you do a wide range of activities of daily living, we may still find that you have a marked limitation in your daily activities if you have serious difficulty performing them without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions.

*Id*.

Mr. Smith's arguments are not unreasonable or plainly erroneous. The evidence that he cites tends to show that his mental impairments "interfere[ ] seriously with [his] ability to function independently, appropriately, effectively, and on a sustained basis."

11

Specifically, the amount of instruction, supervision, and re-training that he required, and his poor results, tend to show that he cannot perform simple chores independently or effectively, without a significant amount of direction and supervision; his belligerence, rudeness, and irritability to residents and supervisors tend to show that he is seriously limited in his ability to perform chores appropriately and in a suitable manner; and his overall poor performance on chores tends to show that his mental impairment seriously interferes with his functional ability. Mr. Smith has shown that the ALJ's reliance on his performance of chores to show only mild restrictions in activities of daily living is not supported by substantial evidence.

In regard to keeping appointments, Mr. Smith argues that this ability has negligible persuasiveness because he was living in a residential treatment facility or supervised apartment, where he received reminders about appointments and medicines, and admonishments for missing work. His argument is not unreasonable or plainly erroneous. As noted, in rating the degree of restriction that a claimant's impairments impose on his activities of daily living, the Commissioner will consider "the amount of supervision or assistance that you require, and the settings in which you are able to function." 20 C.F.R. § 404.1520a(c)(2). The ALJ did not express any recognition or consideration of the effect of Mr. Smith's supervised setting or reminders on his ability to keep appointments. These apparently unevaluated facts tend to support Mr. Smith's argument that he did not have only mild difficulties in keeping appointments "without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis . . . ."

Mr. Smith has shown that the ALJ's reliance on his ability to keep appointments as an indicator of the degree of his restriction in activities of daily living is not supported by substantial evidence.

Therefore, Mr. Smith has shown that two of the three grounds for the ALJ's finding that he had only mild restrictions in performing activities of daily living are erroneous. While Mr. Smith did not challenge the ALJ's reliance on his ability to "leave his home" to seek work and keep appointments with his treatment providers, that one reason out of the three is too thin a basis to provide substantial evidence to support the ALJ's rating in light of his other errors.

**b. Social functioning.** The ALJ found that Mr. Smith has only moderate difficulties in social functioning because **(1)** while he displayed patterns of irritability at times and occasionally had conflicts with other clients at his substance-abuse facility, he also was cooperative with treatment providers by taking directions in performing light chores, generally being cooperative in group therapy sessions, and making progress toward his goals; and **(2)** he reconnected with an ex-girlfriend at one point. "Given this balance of evidence," the ALJ found only a moderate difficulty. (R. 15.)

Mr. Smith cites evidence showing that he had a history of poor attitude and uncooperativeness with staff at the treatment facility and with a supervisor and co-workers at his part-time job. He argues that these "endemic confrontations" do not show appropriate social functioning and they represent a firing offense outside of a sheltered workplace.

Mr. Smith's arguments are not plainly erroneous. In conjunction with the evidence cited in support of his activities-of-daily-living argument, the evidence that Mr. Smith cites here tends to show that he has a serious problem with irritability, rudeness, agitation, and uncooperativeness, specifically when dealing with supervisors, co-workers, and other clients. The evidence tends to show that Mr. Smith did not well take directions and was not generally cooperative. The ALJ did not specifically address the evidence regarding Mr. Smith's conflicts at his part-time job. Although Mr. Smith does not challenge the ALJ's reliance on his reconnecting with an ex-girlfriend "at one point," it is not evident to the Court how this fact supports the ALJ's finding of only moderate difficulties in social functioning. At any rate, in light of Mr. Smith's persuasive arguments against the ALJ's other grounds, it is not evident to the Court that the current "balance of evidence" provides substantial evidence supporting the ALJ's finding of only moderate difficulties in social functioning.

**c. Concentration, persistence, or pace.** The ALJ found that Mr. Smith had moderate difficulties in maintaining concentration, persistence, or pace because, despite evidence showing that he became frustrated easily and had significant problems in this domain, **(1)** he was able to do light cleaning as directed by rehabilitation staff, **(2)** he was able to perform a part-time job later in the relevant period, and **(3)** he volunteered to complete chores. (R. 15.)

Mr. Smith argues that the ALJ's reasons are not supported by substantial evidence for several reasons. First, as he argued against the ALJ's activities finding, the "light

cleaning" that he did was under supervision, repeated instruction and correction, and, on several occasions, resulted in confrontations with facility staff and/or other clients. Second, Mr. Smith argues that Dr. Blake found that he had significant concentration problems during his consultative mental-status examination and the ALJ failed to explain her rejection of that finding. Third, Mr. Smith argues that Dr. Hankee, a consulting examiner who administered a second mental-status examination, also found that Mr. Smith was frustrated and irritable during testing, resulting in poor concentration and resulting in a markedly low I. Q. score, and the ALJ failed to explain her rejection of that finding.

Mr. Smith has not shown error in the ALJ's determination. Although, as indicated above, the Court agrees that Mr. Smith's performance of chores at the residential treatment facility — while under close supervision, with repeated instructions and corrections, and while occasionally being abusive toward staff and other clients — is not a positive indication of his functional abilities, it is not evident that these limiting factors could indicate a marked difficulty specifically of *concentration, persistence, or pace*, as opposed to activities of daily living and social functioning.

In addition, aside from the substance of the ALJ's analysis, the Court does not agree that the ALJ failed to sufficiently *articulate* her discounting of Dr. Blake's and Dr. Hankee's opinions that Mr. Smith had significant concentration difficulties. In another section of her decision, the ALJ provided more explanation of her evaluation of both consulting examiner's opinions. She wrote that their opinions were countered by the

facts that, **(1)** Mr. Smith continued to perform basic chores in accordance with state directions and, despite reports of occasional irritability, he was generally cooperative; **(2)** about the same times as their examinations, Mr. Smith was accepted for one job and interviewed for another, and, within several weeks, obtained work as a security guard; and **(3)** Dr. Schmetzer opined that, despite Mr. Smith's tendency toward irritability and memory complaints, his thoughts remained goal-directed and future-oriented.  (R. 19.)  The ALJ concluded that Mr. Smith's treatment and recovery records indicate a higher level of functioning and active participation in seeking and receiving employment, than Dr. Blake's opinions indicated.  (R. 19.)  This was sufficient articulation.  Finally, Mr. Smith did not challenge the ALJ's reliance on his performance of a part-time job as being inconsistent with the severe concentration difficulties opined by Drs. Blake and Hankee.  The Court concludes that Mr. Smith has not shown that the ALJ's rating of his difficulties in concentration, persistence, or pace were erroneous.

**Conclusion.**  The Court finds that Mr. Smith has shown that the ALJ's rating of his restrictions of activities of daily living and difficulties in maintaining social functioning were erroneous.  Because "marked" findings in each of these functional categories would satisfy the Paragraph B criteria of listing 12.04, a remand is required so that the Commissioner may reconsider these ratings.  While a claimant has the burden to prove satisfaction of a listing at step three, that proof must be made to the Commissioner, not to a court on judicial review.  The Commissioner may show on review that an ALJ's errors

were harmless — *i.e.*, that a remand would be futile — but, as noted, the Commissioner made no such showing in this case.

**2. RFC limits on interactions.** In evaluating the opinion evidence, the ALJ wrote: "I have given significant weight to the two State agency psychological consultants' assessments. They opined the claimant has the capacity to meet the demands of unskilled work tasks with superficial social interaction. The evidence of record, including the subsequent reports, supports their assessments." (R. 21 (citations omitted).) The ALJ defined Mr. Smith's RFC in the following relevant way: "The claimant has the capacity to appropriately interact with supervisors and has the capacity for occasional interaction with coworkers and the general public. Occasional interaction with coworkers and general-public was defined as having the ability to work in vicinity of coworkers and the general-public, but actual interaction for completion of job tasks is limited to one third of the workday." (R. 16.)

Mr. Smith argues that the ALJ's social-interaction RFC deviates from the opinions of the state-agency psychological consultants, to which she gave the most weight and which she found was supported by the record evidence, but she failed to explain her deviation and she failed to build any logical bridge from the evidence and opinions to her greater RFC. Specifically, Mr. Smith points to the ALJ's failure to define any limits on his interaction with supervisors and her allowance of occasional and one-third interaction with co-workers and the public.

The Court agrees with Mr. Smith.  The state-agency psychologists opined that Mr. Smith has the capacity for only "superficial social interaction."  They did not distinguish between supervisors, co-workers, and the public, and they did not distinguish between "vicinity" and "job-task" interactions.  Moreover, "occasional" and one-third-of-the-workday interaction is significantly beyond "superficial" interaction.  Mr. Smith has shown that the ALJ's RFC determination in regard to social interaction restrictions is erroneous.

3.  **Expert medical opinion on listings equivalence.**  One of the severe impairments that the ALJ found (at step two) that Mr. Smith has is "benign paroxysmal positional vertigo with evidence of vestibular weakness."[3]  (R. 12.)  At step three, she

---

[3] **Vertigo** is "**1.** The sensation or feeling of a person that objects are turning in circles around him or her (objective vertigo), or that he or she is turning in space (subjective vertigo).  **2.**  Less correctly, dizziness; i.e., a sensation of movement, seemingly in the head, resulting in a feeling of unsteadiness or lightheadedness."  J. E. Schmidt, *The Attorneys Dictionary of Medicine and Word Finder* at V-93 (Rel. 48, Sept. 2014).

**Benign positional vertigo** is "a self-limited disease of unknown cause that usually represents a peripheral lesion.  It is caused by debris lodging within the posterior semicircular canal.  It can also be seen after head trauma.  * * * Patients with benign positional vertigo (BPV) complain of a sudden but brief whirling sensation with changed in position, accompanied by nausea and vomiting.  Symptoms are not always reproducible, but vestibular position testing should demonstrate nystagmus."  9 Ausman & Snyder, *Medical Library, Lawyers Edition*, p. 171-72 (1992 (Aug. 2014 Supp.)).

**Paroxmal** refers to "[a] sudden attack of a disease or a sudden intensification of the symptoms, especially when recurring periodically . . . ."  *Atty's Dict. of Med.* at P-88.

**Benign paroxysmal positional vertigo (BPPV)** is

one of the most common causes of vertigo — the sudden sensation that you're spinning or that the inside of your head is spinning.

Benign paroxysmal positional vertigo is characterized by brief episodes of mild to intense dizziness. Symptoms of benign paroxysmal positional vertigo are triggered by specific changes in the position of your head, such as tipping your head up or down, and by lying down, turning over or sitting up in bed. You may also feel out of balance when standing or walking.

evaluated his vertigo under the 11.00 series of listings (neurological impairments) and found that the criteria were not satisfied: "The record evidences the condition without pathology, and physical examinations were unremarkable. This does not meet any 11.00 series listing." (R. 14 (citation omitted).) Mr. Smith argues that the ALJ did not have the required expert medical opinion on the subject of whether his vertigo, singly or in combination with his other impairments, medically equaled a listing. He also argues that the applicable listings for vertiginous disorders are 2.07[4] and/or 11.02.[5]

Mr. Smith's argument is reasonable. Whether a claimant's impairments — severe and non-severe, singly or in combination — medically equal the severity of a listing is a medical question, requiring expert medical opinion. S.S.R. 96-6p. The findings of state-agency medical reviewers recorded on Disability Determination and Transmittal ("D.D.T.") forms "ensures that consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review." *Id.* Such forms are present in the

---

Although benign paroxysmal positional vertigo can be a bothersome problem, it's rarely serious except when it increases the chance of falls.

Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/vertigo/basics/definition/con-20028216 (last visited March 9, 2014).

**Vestibular** refers to the vestibule, "the central part of the inner ear, between the cochlea and the semicircular canals." *Atty's Dict. of Med.* at V-98 and V-100.

[4] "*Disturbance of labyrinthine-vestibular function (including Meniere's disease),* characterized by a history of frequent attacks of balance disturbance, tinnitus, and progressive loss of hearing." *Listings* § 2.07.

[5] "*Epilepsy — convulsive epilepsy, (grand mal or psychomotor),* documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment." *Listings* § 11.02.

record.  (R. 69-80.)  However, these state-agency reviews occurred in 2011, before Mr. Smith first reported and sought treatment for his vertigo in 2012, and, therefore, before the medical and other evidence regarding that impairment had entered the record.  Thus, the ALJ could not have relied on the D.D.T.s for the required expert medical opinion on listings equivalence, and she cites no other such medical opinion.

Although the ALJ explained her listing finding that Mr. Smith's vertigo "does not meet any 11.00 series listing" with only the observations that the condition was "without pathology" and "physical examinations were unremarkable," (R. 14), she had already found at step two that it was severe, meaning that it "significantly limit[s] [his] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a).  The lack of pathology and remarkable examination findings might have justified the ALJ in finding that Mr. Smith's vertigo was not an impairment, 20 C.F.R. §§ 404.1508 and 416.908, but she had found that it qualified as a severe impairment.  As an impairment, and a severe one particularly, she was required to have expert medical opinion on whether it, alone or in combination with Mr. Smith's many other severe and non-severe impairments medically equaled a listing.  Mr. Smith is also persuasive that the ALJ should have considered whether listing 2.07 was also applicable, in addition to listing 11.02.

The Court finds that the ALJ's listing analysis was erroneous and must be reconsidered on remand.

**Conclusion**

The Commissioner's denial of Mr. Smith's claim for disability benefits is **REVERSED** and his claim is **REMANDED** to the Commissioner for reconsideration and rehearing consistently with these instructions:

**1.** The Commissioner shall reconsider and rearticulate her ratings for the activities-of-daily-living and maintaining-social-functioning elements of the Paragraph B criteria of listing 12.04. In reconsidering the degree of Mr. Smith's restrictions of activities of daily living, she shall not rely on his ability to perform light chores under supervision or his ability to keep group- and individual-therapy appointments. In reassessing the degree of Mr. Smith's difficulties in maintaining social functioning, the Commissioner shall not rely on Mr. Smith's ability to take directions in performing light chores and she shall consider his record of irritability and conflicts with supervisors, co-workers, and other clients, and his record of conflicts at his part-time job.

**2.** The Commissioner must reconsider her defined RFC restrictions relating to Mr. Smith's interactions with supervisors, co-workers, and the public. She must expressly reconcile her accordance of significant weight to the state-agency psychologists' opinions limiting Mr. Smith to only superficial social interaction with her RFC containing no restriction on his interaction with supervisors, allowing occasional interactions with co-workers and the public, and allowing one-third-workday interactions for completion of job tasks.

**3.** The Commissioner must obtain expert medical opinion on the issue of whether Mr. Smith's impairments, including his severe impairment of vertigo, medically equal any of the listings, particularly listings 11.02 and 2.07.

**DONE this date:** 03/13/2015

Denise K. LaRue
United States Magistrate Judge
Southern District of Indiana

Distribution to all ECF-registered counsel of record *via* ECF-generated e-mail.